**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| ) | |
| ) | |
| BOOKER T. WILLIAMS, ) | CASE NO. 03-1983 |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Magistrate Judge Caiazza |
| ) | |
| ) | |
| PITTSBURGH PUBLIC SCHOOLS, ) | |
| a.k.a. PITTSBURGH SCHOOL ) | |
| DISTRICT, KEVIN BIVINS, ) | |
| Principal, and the ) | |
| PITTSBURGH BOARD OF PUBLIC ) | |
| EDUCATION, ) | |
| ) | |
| Defendants. ) | |
| ) | |

## MEMORANDUM OPINION

Booker T. Williams ("Williams"), was employed as a day-to-day substitute teacher in the Pittsburgh School District ("the District")[1] from January 2000 until his termination in March 2002. He alleges that the Defendants violated state and federal law by terminating his employment based on age and by retaliating against him for filing discrimination charges with state and federal administrative agencies.[2]  The Defendants' Motion for

---

[1]Williams has named as Defendants the Pittsburgh Public Schools, the Pittsburgh School District, and the Pittsburgh Board of Public Education. Because these Defendants are not separate entities for purposes of this litigation, the court refers only to the District.

[2]Williams first filed his complaint pro se. He later hired counsel, and amended the Complaint. In Counts I and V, Williams alleges that he was terminated from his position as a substitute teacher on the basis of his age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. Sections 621 - 634 (2000), and the Pennsylvania Human Rights Act ("PHRA"), 43 PA. STAT. Sections 951-63. In Count II, Williams maintains that his termination was effected in retaliation for his having filed age discrimination claims

Summary Judgment is pending. Because the court finds that Williams has failed to meet his burden of proof with respect to any of the claims alleged, it will grant the Defendants' Motion.

## I. Background

### A. The Facts

In January 2000, Williams, then seventy-three years old, was hired by the District as a floating day-to-day substitute teacher. If he was needed to teach on a given day, he would receive an early morning automated voice mail from the District's Human Resources Department conveying relevant information about the opening. Williams could then choose whether to accept the available assignment.(Defs. Mot. Sum. J. Ex. C).

Over the course of his twenty-seven months as a substitute, Williams worked two or three days per week in a total of about 150 schools at grade levels ranging from pre-school to senior high.(Id. Ex. A 15; A 16, 48; Q 4). He appeared to be well-qualified to perform as a substitute, holding degrees from Duquesne University and the University of Rochester. Williams also had a teaching certificate and prior teaching experience. (Am. Compl. ¶9).

Williams contends that his time in the Pittsburgh School

---

with the Pennsylvania Human Relations Commission ("PHRC") and the Equal Employment Opportunity Commission("EEOC"). Count III alleges racial discrimination in violation of 42 U.S.C. Section 1981, and Count IV alleges deprivation of due process in violation of 42 U.S.C. Section 1983.

System went well. He was willing and able to perform his duties, and did an adequate job with whatever assignment he was given. (Am. Compl. ¶¶ 12-13.). According to Williams, personnel at the schools to which he was assigned were satisfied with his teaching; he was unaware of any problems or complaints prior to spring 2002 while he was teaching at Fort Pitt Elementary School. Williams alleges that one afternoon he had a brief hallway conversation with Defendant Kevin Bivins ("Bivins"),the school principal. Bivins allegedly "questioned [Williams] about his age in an unwelcome manner," and expressed "shock" when Williams revealed that he was over seventy. He then "asked in a sarcastic and insincere manner why Williams was not at home entertaining his grandchildren." ( Am. Compl. ¶¶ 16-18).

Williams contends that these comments evidenced an age-based animus which motivated Bivins to contact the District, requesting that Williams not be assigned to teach at Fort Pitt in the future. According to Williams, in order to explain why he was no longer welcome at Fort Pitt, and hoping to have him fired outright, Bivins fabricated vague accusations regarding Williams's inappropriate interaction with four students. Helped by the students' willingness to lie, Bivins compiled a full report documenting the details of the students' complaints, and forwarded this report to the District. Williams alleges that a short time later, he was asked to meet with Thelma L. Morris

-3-

("Morris"), Assistant Director of the District's Department of Human Resources and supervisor of the day-to-day substitute teacher program. At their March 25, 2002 meeting, Morris discussed with Williams the fact that twelve school administrators had complained about his performance and had asked that he not be called again for substitute openings in their schools. She also discussed Bivins' report specifically, informing Williams that because of the number and nature of the complaints against him, his employment as a substitute teacher for the District was terminated.[3] (Morris Aff. ¶15);(Williams Dep. 55-56);(Defs. Stmt. of Facts ¶ 43). Williams complained that he had not been made aware of all of the complaints. Morris was not swayed, and confirmed the termination in writing the same day. (Id., ¶ 47). On April 24, 2002, the Board of Education accepted Morris's recommendation, and terminated Williams's employment "with cause." (Am. Compl. ¶ 52). In early June, Williams received a letter from the Board notifying him that it had accepted Morris' recommendation that he be terminated effective March 25, 2002.

### B. Procedural History

On May 20, 2002, Williams filed a complaint alleging age discrimination with the PHRC, and cross-filed with the ("EEOC").

---

[3] 'Morris had authority to recommend that substitute teachers be terminated. Recommendations were submitted to the Board for final approval. (Morris Aff. Paragraph 18).

After an investigation of the merits of the matter, the PHRC, on September 30, 2002, dismissed the complaint based on its failure to find probable cause to support Williams' claim. Almost exactly one year later, the EEOC provided Williams with a letter of right to sue.

In February 2004, Williams, acting pro se, filed a complaint in the District Court for the Western District of Pennsylvania. After retaining counsel, Williams filed an amended complaint. The Defendants' motion to dismiss that complaint was granted in part and denied in part by an order dated December 15, 2005.[4]

Discovery was conducted, and the Defendants' Motion for Summary Judgment is ripe for adjudication.

### C. **Standard of Review**

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." A "material fact" is one that "might affect the outcome of the suit." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248,(1986).

While the moving party has the initial burden of identifying

---

[4]The following claims made in the amended complaint were dismissed: (1) the ADEA claim as to Bivins individually; (2) all claims made pursuant to 42 U.S.C. Sections 1981 and 1983; and (3) the request for punitive damages.

evidence demonstrating the absence of a genuine issue of material fact, the nonmoving party must make a showing sufficient to establish the existence of every element necessary to its case and on which it bears the burden of proof. *See* <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317(1986). Credibility determinations are not the function of the judge; rather, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." <u>Anderson</u>, 477 U.S. at 255. With this standard in mind, the court turns to the issues.

## II. <u>Discussion</u>

### A. <u>The ADEA Claim</u>

In order to establish a prima facie claim for age discrimination, the plaintiff bears the burden of establishing that: (1) he was over the age of forty; (2) he was qualified for the job in question; (3) he suffered an adverse employment action; and (4) that a similarly situated younger person was treated more favorably. <u>Knight v. Baptist Hosp. of Miami, Inc.</u>, 330 F.3d 1313, 1316 (11th Cir. 2003)  If the plaintiff is able to establish each element of the claim, the burden of production shifts to the defendant, who must offer evidence of a legitimate non-discriminatory reason for its action. <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). "If that showing is made, the burden, which is now more significant, shifts back to the employee." <u>Billet v. Cigna Corp.</u>, 940 F.2d 812, 816 (3d Cir.

1991), *abrogated in part on other grounds by* <u>St.</u> <u>Mary's Honor</u> <u>Center v. Hicks</u>, 509 U.S. 502 (1993).

In order to avoid summary judgment, the plaintiff is required to show, by a preponderance of the evidence, that (1) the legitimate reason articulated by his employer is not worthy of credence; or (2) the employer's action was more likely to have been motivated by discrimination. <u>Sullivan v. Standard Chlorine of Del. Inc.</u>, 845 F. Supp. 167, 175 (D. Del. 1995). The plaintiff's "evidence must be sufficient to support a *reasonable* inference that the explanation given for the employment decision is a pretext for discrimination." <u>Id.</u> (emphasis in original). A pretext cannot be established unless the reason offered by the employer "was false, *and* . . . discrimination was the real reason." <u>Id.</u> (quoting <u>Hicks</u>, 509 U.S. at 512 n.4)(emphasis in original). The burden of persuasion remains with the plaintiff at all times.

## 1. <u>The Prima Facie Case</u>

The Defendants[5] argue first that they are entitled to summary judgment on Williams' discrimination claims because he has failed to establish two of the four elements of his prima facie case, i.e. that he was qualified for the position of

---

[5]Although the discrimination claim against Bivins is based on the PHRA, the court's discussion of the ADEA claim against the District applies to him as well. The analysis of claims under the ADEA applies with equal force to claims made under the PHRA. <u>Kelly v. Drexel Univ.</u>, 94 F.3d 102, 105 (3d Cir. 1996).

-7-

substitute teacher, and that a similarly situated younger person
was treated differently. The essence of the Defendants' first
argument is that Williams performed so poorly as a substitute
teacher that he could not have been qualified for the job. This
argument conflates very closely related, but distinct issues. The
focus at this stage of the case is on whether Williams was
qualified to do the work, not on whether he was good at what he
did. Matczak v. Frankford Candy & Choc. Co., 136 F.3d 933, 939
(3d Cir. 1997).

It is undisputed that Williams was a well educated man with
apparently satisfactory teaching experience. He had the
credentials critical to the position, and has satisfied at least
the minimum requirements of the job. Being qualified to do
something, though, is no guarantee of good, or even adequate
performance. Virtually anyone can be qualified to drive if he
passes the requisite tests, and secures insurance. Accident
statistics and common experience show, however, that a person who
is qualified to drive may, nonetheless, be a menace on the road.

The Defendants' remaining argument regarding Williams' prima
facie case is not so easily resolved.  Normally, as the court has
noted, a plaintiff in an age discrimination case is required to
show that a similarly situated younger person was given
preferential treatment. Williams, however, has failed to compare
himself to anyone.  The record does not contain information
concerning the age distribution of the District's substitute

-8-

teachers, or data regarding other teachers' "do not call" statistics. Williams has not named or provided the age for any other substitute teacher, and he certainly has not established that preferential treatment was given to any employee, much less to a younger "similarly situated" substitute teacher, i.e. one whose name was placed on the "no call" list of at least twelve different schools over a two year period.  In the absence of any comparison of his own treatment to the treatment extended to any other employee, Williams faces a formidable challenge in attempting to raise an inference of age discrimination.  Given this gap in his case, and the absence of any attempt to address it, it would be reasonable for the court to resolve Williams' ADEA claim by finding that he did not establish a prima facie case. In the interest of completeness, however, and in light of case law cautioning that courts should be flexible regarding the need for comparison data,[6] the court will not decide the Defendant's motion for summary judgment on this basis.

The court will assume, instead, that Williams has established a prima facie case under the ADEA, and will assess, in accordance with the burden shifting framework constructed in McDonnell Douglass, whether the District has articulated a

---

[6]See, e.g., Pivorotto v. Innovative Systems, Inc., 191 F.3d 344, 355 (3d Cir. 2005)(recognizing tht a plaintiff can state a prima facie case even without showing that employees outside of the protected class were treated more favorably.) The precise elements which must be shown to establish a claim vary with the circumstances. Fasold v. Justice, 409 F. 3d 178, 185 n.10 (3d Cir. 2005).

legitimate nondiscriminatory basis for its decision to discharge Williams.

### 2. **The District's Grounds for Terminating Williams**

The School District contends that its decision to terminate Williams was based solely on his deficient performance during his term as a substitute teacher.

Just weeks after he was hired by the District as a substitute teacher, administrators at the schools to which he was assigned began to receive troubling reports. In February 2000, a Carmalt Elementary School student reported that Williams, his temporary teacher, had called him a "smartass." (Defs. Mot. Sum. J. Ex. M).[7]

On March 28, 2000, the principal of Lemington Elementary lodged the following complaint with the District:

> Since his arrival, Mr. Williams has had difficulty with classroom management and has needed assistance from administration, and other teachers. In an attempt to help Mr. Williams, on Tuesday, March 28th . . . he was asked to substitute for one of two teachers who would be out March 28 and 29, it was my belief that [he] would do better with the one class rather than the six he was presently teaching.
>
> Mr. Williams seemed somewhat upset about this arrangement, and at approximately 8:45 AM he arrived at the office, and informed me that he no longer wanted to stay at Lemington and left . . . I was astounded when he left his class, [and] came and informed me that he was leaving.

---

[7]There are also allegations in this exhibit that Williams called another student an "idiot" or an "asshole."

(<u>Id.</u>, Ex. L)(punctuation in original).

In June 2000, Williams was placed on the "do not call" list for Dilworth Elementary School. (<u>Id.</u> Ex. R.) Robert O'Keefe, the Dilworth principal explained:

> 6. I received numerous complaints regarding Mr. Williams'[sic]. These complaints generally related to Mr. Williams' overall inability to manage his classroom.
>
> 7. Specifically, students were disorganized, out of seats, out of classrooms, and teaching staff were called away from their instructional duties to manage a potentially serious safety situation.
>
> 8. Based on Mr. Williams' poor conduct, I determined that he should no longer be used as a substitute for Dilworth Traditional Academy.

(Id. Ex. I).

Williams was removed from the approved substitute list at Martin Luther King Elementary School in December 2000. Patrica Fisher, the school principal, described her experience with Williams:

> 7. I cannot recall the specific incident that led to my request for Mr. Williams to be removed from the substitute list at Martin Luther King, Jr. Elementary. However, Mr. Williams, when substituting at King, lacked control of the class and generally demonstrated a lack of respect in the manner in which he addressed students.

(<u>Id.</u> Ex. E).

The fifth negative report concerning Williams' performance was received by the District early in January 2001. The record does not contain the details of this report, but it does show

-11-

that Williams was placed on the "do not call" list at Fulton Academy Elementary School. Less than two weeks later, Williams was barred from substitute teaching at Lincoln Elementary School. The school principal stated that Williams had left students unattended and refused to follow the substitute folder activities left for him in the classroom.( Defs. Mot. Sum. J. Ex. F).

Friendship Elementary School's principal, Carol Heyward, cited Williams' inability to manage his classroom as the reason for her February 26, 2001 request that Williams not be returned to Friendship. In April 2001, the District received an eighth complaint, the second from personnel at Carmalt Elementary. (Id., Ex. M). Two parents of children at Carmalt had contacted the school to complain about Williams' inability to control his temper and his alleged threat to "put [a student] through the wall." Id. Williams told the administration at Carmalt and wrote to Thelma Morris ("Morris"), the Assistant Director of Human Resources for the Board, that he had never used the language attributed to him. Id. Williams was added to Carmalt's "do not call" list in May.

In June 2001, Regent Square Elementary's principal notified the District that Williams should not be permitted to teach at that school. Miller Elementary added Williams to its "no call" list in November of the same year. Miller's principal reported that the school's curriculum coordinator found Williams to be a "very difficult individual" who would "not allow her to give him

instruction." A college-age classroom volunteer stated that
Williams insulted and upset her.(Defs. Mot. Sum. J. Ex. G).

Only days into January 2002, personnel at the District's
pre-school program asked that Williams not be sent to them again.
He next was placed the "do not call" list at West Liberty
Elementary School, on February 8, 2002. Five days later, the
Westinghouse High School principal requested that Williams not be
referred to the school again. Her affidavit reads in relevant
part:

> 6. I have received numerous complaints regarding
> Mr. Williams' [sic]. These complaints generally related
> to Mr. Williams' overall inability to manage his
> classroom.
>
> 7. Specifically, students would walk in and out
> of his classes, lesson plans were not followed,
> and Mr. Williams had difficulty responding
> appropriately to feedback from administrators.

(Defs. Mot. Sum. J. Ex. H)

In March 2002, Sylbia Kunst asked that Williams not return
to Concord Elementary School. She noted that parents had "called
the school with concerns about how Mr. Williams was addressing
the students, in a loud, angry voice." (Defs. Mot. Sum. J. Ex.
F). After his first of two days scheduled at Concord, Kunst asked
Williams not to return for the second day. Despite this request,
Williams reported for work. The school did not have security and
Kunst believed that it would be unsafe to confront him. She and
another school employee remained in Williams' classroom for the
day to monitor his behavior.

-13-

Morris was aware that many principals had expressed strong dissatisfaction with Williams' performance as a substitute teacher. She states that she met with Williams after the first complaints from Carmalt Elementary to discuss the allegations of misconduct. (Defs. Mot. Sum. J. Ex. C). Williams denied any inappropriate behavior.

Morris states that she met with Williams again "on a number of occasions" to discuss complaints made against him "and to suggest areas of personal improvement." Id. These discussions did not effect any lasting change in his teaching "style". The rapidly cooling relationship between Williams and the District froze, and then fractured in March 2002 when Williams was called to substitute at Fort Pitt Elementary School. During his time at that school, four students reported that he had engaged in serious physical contact with them. (Defs. Mot. Sum. J. Ex. N). Bivins, the school principal, interviewed these students, and took their statements. One student stated that Williams choked him.  A second wrote: "He hit me with a stick on my hand. I fell and my tooth fell out. He hit Tavon on his arms (shoulders) hard." A third student alleged that Williams grabbed his neck, causing the student to cut his lip on a table. The fourth student wrote: "The man grabbed me up in the air. He grabbed on my shirt and he lifted me up." Id. The same boy also alleged that Williams had snatched hats from him and another student. Bivins discussed these allegations with Williams, who denied them all.  Bivins

-14-

then scheduled a meeting with Williams and the children's parents. Only one parent attended.

At the conclusion of his investigation, Bivins summarized the events for Morris, and asked that Williams not be permitted to substitute at Fort Pitt again. Morris asked Bivins to put this request in writing. In response, Bivins prepared a memorandum detailing the substance of the allegations made against Williams He attached the statements of the students involved, and sent the documents to Richard Mascari, Executive Director of the Pittsburgh Board of Public Education and to Morris.

After reviewing these materials, Morris scheduled a March 25, 2002 meeting with Williams. At this meeting, she informed him that his employment would be terminated due to the many complaints about his performance.

The District's evidence documenting the shortcomings in Williams' performance as a student teacher is more than sufficient to satisfy the District's relatively light burden to articulate "a facially legitimate reason" for terminating him. Lewis v. University of Pittsburgh, 725 F.2d 910, 914 (3d Cir. 1983). At this point, the analytic framework of McDonnell Douglas requires the court to revisit the record in order to determine whether Williams adduced evidence sufficient to demonstrate that the District's explanation was pretextual, i.e. a fiction intended to obscure the reality of age-based discrimination.

### 3. **Williams' Allegations of Pretext**

Establishing pretext "places a difficult burden on [Williams]." <u>Fuentes v. Perskie</u>, 32 F.3d 759,765 (3d Cir. 1994). In order to avoid summary judgment, he must show such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [District's] proffered . . . reason[ ] for [terminating him] that a reasonable factfinder *could* rationally [find] it 'unworthy of credence.'" <u>Id.</u> (internal citation omitted)(emphasis in original).

Following a painstaking review of the record, the court concludes, without hesitation, that Williams has failed to make even a minimal showing of pretext. In attempting to meet his burden, Williams depends on the one-time statements alleged to have been made by Bivins during Williams' assignment to Fort Pitt Elementary. At his deposition Williams testified that he did not recall anyone else making age-related comments, and that Bivins did not mention age again. (Defs. Mot. Sum. J. Ex. A 47).

Williams contends, nonetheless, that he was terminated based on Bivins' comments. He constructs this argument as follows:

> (1) Bivins' comments about Williams' age reveal that he held and was motivated by age-based animus <u>Id.</u>, at 53;
>
> (2) In order to have Williams removed from Fort Pitt and to conceal discriminatory bias, Bivins fabricated student complaints about Williams, <u>or</u> credited and acted upon the students' allegations even though he knew they were false, <u>Id.</u> at 35-37;
>
> (3) Knowing that Williams had not engaged in questionable

-16-

conduct, Bivins sent a false report about the incidents to Morris;

(4) Morris believed the fabricated statements concerning Williams' interaction with the Fort Pitt students, and terminated Williams on the basis of Bivins' false information. Id., 54;

(5)The real reason for Williams' termination was, therefore, discrimination based on age.

These allegations of pretext are much too thin to cast doubt on the legitimacy of the District's proffered reason for Williams' discharge. It is manifestly clear that Williams was aware, prior to March 25, 2002, that there were serious issues with his performance as a substitute teacher.[8] These issues and his failure to address them - not his age - were his undoing.

The only age-based reference in the record consists of Bivins' comments[9] made once by a high school principal who lacked

---

[8]Morris states in her affidavit that she met with Williams several times to discuss his lack of rapport with students, school administration, and staff. Williams certainly knew well before he was terminated that performance-based complaints had been raised at least twice at Carmalt Elementary. He had written twice to Morris denying all responsibility for that conduct. Even if Morris never talked to him about the other complaints, he should also have known that something was wrong when the principal and another member of the staff at Concord Elementary School found it necessary to remain in his classroom all day.

In the face of overwhelming evidence that he acted inappropriately on many occasions, Williams continues to deny responsibility for his actions and, incredibly, attempts to shift that responsibility to his students, asking the District and the court to believe that students concocted their accounts of his conduct.

[9] Williams does not contend that Bivins' statements were direct evidence of discrimination within the meaning of Price Waterhouse v. Hopkins, 490 U.S. 228 (1989). Had the argument been raised, the court would have rejected it. Isolated "stray comments," even if they are deemed to be discriminatory, do not constitute evidence of direct

authority to retain or terminate Williams. Williams cannot make any rational connection between Bivins' age-related comments and his ultimate loss of employment with the District. The evidence does not show that Bivins, when he contacted Morris, was aware that there had been other complaints about Williams. It is doubtful, then, that he could have anticipated that his single conversation with Morris would result in Williams' termination.

Even if the court were to find, and it certainly does not, that Bivins had an irrational and intractable desire to rid the District of everyone over the age of 40, Williams's pretext argument is till fatally flawed.. The record does not establish that Morris - or anyone else employed by the District - knew of Bivins' age-based prejudice.  If neither Morris nor the board was aware of that prejudice, it could not have been the basis for the termination decision.

Williams recognizes that Morris had already decided to terminate him when she initiated their meeting, and that he did not tell her about Bivins' comments until the meeting was underway. (Defs. Mot. Sum. J. Ex. A 37-54). Williams also testified that though he told Morris about Bivins' remarks, he only _implicitly_ told her that he believed that the remarks reflected discriminatory bias. The record does not provide any

---

discrimination. The same is true with respect to remarks made by a non-decisionmaker. Fakete v. Aetna, Inc., 308 F.3d 335,338 (3d Cir. 2002).

evidence at all to suggest that Morris did not believe or should not have believed that Williams had genuine performance-related difficulties.

Williams drove the final coffin nail in his pretext argument when he testified at his deposition that Morris told him that at least four <u>additional</u> complaints figured in her decision to terminate him. Williams real argument seems to be that it was wrong for the District to terminate him based on five, or even twelve instances of allegedly inappropriate conduct. He seems to say that because no one from the District witnessed problems with his teaching, and student statements are inherently unreliable, he should have been treated more leniently.[10]

The court vehemently disagrees. The allegations leveled against Williams involved multiple instances of physicality and profanity directed at children, most of whom were in <u>elementary</u> school.  The court can only wonder why it took so long for the District to remove Williams from the system and what procedure it has in place to monitor the number and nature of complaints lodged against substitute teachers.

---

[10]To discredit the District's proffered reason for his termination, the plaintiff cannot simply show that the employer's decision was wrong or mistaken. As another court has put it, "federal courts are not arbitral boards ruling on the strength of 'cause' for discharge. The question is not whether the employer made the best, or even a sound . . . decision; it is whether the real reason [was discrimination]." <u>Carson v. Bethlehem Steel Corp.</u>, 82 F.3d 157, 159 (7th Cir. 1996).

When Williams' evidence is considered as a whole, it is clear he has not established, by a preponderance of the evidence - or by any evidence at all - that the District's explanation for his discharge was pretextual. As a result, no reasonable factfinder could conclude that the District's performance-based justification was false, <u>or</u> that the termination decision was instead more likely to have been based on age discrimination. Williams' failure to establish <u>both</u> of these propositions is fatal to his ADEA claim. <u>Hicks</u>, 509 U.S. at 512 n.4. The District is entitled to summary judgment.

### B. <u>The PHRA Claim Against Bivins</u>

Because the court has determined that the record does not support a claim of age discrimination in violation of the ADEA, Bivins cannot be liable for aiding and abetting the discrimination.  He is, therefore, entitled to summary judgment on the state law claims brought pursuant to the PHRA.

### C. <u>The Retaliation Claim</u>

Williams' final argument is that he was discharged in retaliation for filing administrative charges with the EEOC and the PHRC. In order to establish a prima facie claim for retaliation, a plaintiff must show that: 1) he was engaged protected activity;(2) the employer cause him to suffer an adverse employment action after or at the time of the protected activity; and (3) the employee's participation in the protected

activity was the cause of the adverse action. <u>Farrell v. Planters</u> <u>Lifesavers Co.</u>, 206 F.3d 271, 279 (3d Cir. 2000). Williams has failed to meet the second and third requirements of a viable retaliation claim. Because Williams was terminated on March 25, 2002, and his EEOC and PHRA claims were not filed until May 20, 2002 he cannot satisfy the timing requirement or show causation.[11] Williams seeks to avoid these deficiencies in his case by arguing that although Morris did terminate his employment, she did not specify that she did so "for cause." According to Williams, as long as words "for cause" were not incorporated in his termination notification, he remained eligible for positions as a full time substitute or permanent teaching position.[12] It was only on May 28, 2002, when he received a termination letter from Dr. Dwight Mosley, the

---

[11]This is not a situation similar to the one discussed in <u>Fasold</u> <u>v. Justice</u>, 409 F.3d 178 (3d Cir. 2005). In that case, a plaintiff was permitted to pursue a retaliation claim even though his administrative complaint was filed after he received a notice of termination. There, however, a formal grievance procedure existed and could be invoked to appeal a termination decision. The termination did not become final until the conclusion of the grievance process. Furthermore, in <u>Fasold</u>, the decision denying the employee's second grievance made specific negative reference to the administrative filings, calling them "preposterous." This type of evidence is missing here.

[12]There is no evidence in the record to substantiate this allegation. Regardless of whether Morris designated his termination as one "for cause", Williams had received more that three unsatisfactory ratings in one semester, and was already ineligible to reapply as a substitute, or to apply for permanent or regular teaching positions in the District. (Defs. Reply Br. Ex. H).(This rule could not have been strictly applied in Williams' case, or he would not have been permitted to work as a substitute teacher after the first semester of 2001.)

District's Chief Human Resources Officer, that Williams learned that he had been officially terminated "for cause." Williams argues, without the benefit of supporting authority, that the May 28 letter constituted a second adverse employment action. This "second termination" was worse that the first because his termination "for cause" rendered him ineligible for any alternate District positions. It is this second "worse" termination that Williams contends was the adverse employment consequence effected in retaliation for his having filed administrative claims.

      The court rejects this argument. First, there is no evidence in the record to suggest that the wording of the termination letter had any bearing on jobs open to Williams. Furthermore, "once an employee's position has been terminated, it is no longer possible for him to suffer an adverse employment action." Glanzman v. Met. Mgmt. Corp., 391 F. 3d 506, 516 (3d. Cir. 2004). Morris' decision to terminate Williams constituted adverse action; steps taken afterward in order to effectuate the discharge did not. Caver v. City of Trenton, 420 F.3d 243, 255 (3d Cir. 2005).

   Williams' argument also ignores the fact that his termination "for cause" was approved by the Board at a meeting on April 24, 2002, nearly a month before he filed administrative charges. (Am. Compl. ¶ 52). The decision of the Board to dismiss Williams with cause was not the result of his having engaged in

-22-

protected activity. By the time that Williams filed complaints with the PHRC and the EEOC, his termination "for cause" was a fait accompli. That he not learn about the action taken at the April 24 Board meeting until after he had filed the administrative complaints is irrelevant.

As to the retaliation claim, too, the District is entitled to summary judgment.

### III. <u>Conclusion</u>

For the foregoing reasons, the Defendants' Motion for Summary Judgment (Doc. 38) should be granted as to all claims.

In accordance with the Magistrate's Act, 29 U.S.C. § 636 (b) (1) (B), 636 (b)(1)(b) and (c), and Rule 72.1.4 (B) of the Local Rules for Magistrates, objections to this Report and Recommendation are due by March 16, 2006. Responses to objections are due by March 27, 2006.


February 28, 2006




                                        S/ Francis X. Caiazza
                                        Francis X. Caiazza
                                        U.S. Magistrate Judge


cc:

Gretchen K. Love, Esq.
555 Grant Street, Suite 310

-23-

Pittsburgh, PA 15219


Anthony R. Sosso, Jr., Esq.
1310 Freeport Road
Pittsburgh, PA 15238